AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT
12/16/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ AP _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT
12/16/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: D. Brown_____ DEPUTY

| | |
|---|---|
| United States of America | |
| v. | |
| Mario Esquivel Vargas, | Case No.  5:21-mj-00733 |
| Defendant. | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of June 8, June 17, and November 4, 2021, in the county of Riverside, in the Central

District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) | Distributing 50 grams or more of Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
/s/ pursuant to Fed. R. Crim P. 4.1
*Complainant's signature*

_____
Estevan Banuelos, FBI, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:       December 16, 2021

_____
*Judge's signature*

City and state:   Riverside, California

Hon. Kenly Kiya Kato, U.S. Magistrate Judge
*Printed name and title*

AUSA: Ruben Escalante, (951) 276-6212

## AFFIDAVIT

I, Estevan Banuelos, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Mario Esquivel VARGAS ("VARGAS") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (distributing 50 grams or more of methamphetamine).

2. This affidavit is also made in support of an application for a warrant to search 520 Mount Vernon Ave., Barstow, CA 92311 (the "SUBJECT PREMISES A"), as described more fully in Attachment A-1.

3. This affidavit is also made in support of an application for a warrant to search 3727 W. Main St., Space 5, Barstow, CA 92311 (the "SUBJECT PREMISES B"), as described more fully in Attachment A-2.

4. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution of and possession with intent to distribute controlled substances), 846 (conspiracy and attempt to distribute controlled substances), and 843(b) (unlawful use of a communication facility to facilitate drug trafficking) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A-1, A-2, and B are incorporated herein by reference.

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

6.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since October 2019. I am currently assigned to the FBI Los Angeles Field Office, Victorville Resident Agency, where I conduct violent-crime investigations. I have completed the 18-week training program given by the FBI, which includes instruction in the investigation of various criminal offenses governed by federal law. I have received training in the enforcement of the laws of the United States, including training in the preparation, presentation, service, and execution of criminal complaints as well as arrest and search warrants.

7.    Based on my training, experience and conversations with other narcotics investigators, I am familiar with drug traffickers' methods of operation, including the distribution, storage, transportation of drugs, and the collection of drug proceeds. I have received training and have collaborated with

other law enforcement officers about investigations regarding the unlawful importation, possession, and distribution of controlled substances, as well as related money laundering statutes involving the proceeds of specified unlawful activities and conspiracies associated with criminal narcotics, in violation of Titles 18 and 21 of the United States Code.

### III. SUMMARY OF PROBABLE CAUSE

8.    On June 8, 2021, investigators initiated a controlled drug buy with an unknown male, later found to be VARGAS, utilizing a Confidential Human Source ("CHS"). VARGAS sold the CHS approximately two ounces of methamphetamine for $1,100.

9.    On June 17, 2021, investigators initiated another controlled drug buy with VARGAS. Investigators established surveillance around SUBJECT PREMISES A and identified a male, later found to be VARGAS, entering the home. After receiving the call from the CHS, investigators followed VARGAS to the vicinity of SUBJECT PREMISES B where investigators saw him parking in front of a trailer and exiting the trailer park. Investigators later captured VARGAS on video executing the drug buy with the CHS for three ounces of methamphetamine.

10.    On November 4, 2021, investigators initiated a controlled buy, again utilizing the CHS. Investigators established surveillance around SUBJECT PREMISES A where they saw VARGAS exiting and driving to SUBJECT PREMISES B. A pole camera and aerial surveillance captured VARGAS and another unknown male enter SUBJECT PREMISES B and then exit a short time later. VARGAS then drove to another home located at 932 E.

Virginia Way, Barstow, CA 92311. VARGAS and the unknown male entered the home briefly, and VARGAS exited and returned to SUBJECT PREMISES A before meeting with the CHS to sell the CHS one pound of methamphetamine.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

11. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

   **A.   CHS tip and another confidential tip received by Barstow Police department**

12. In November 2020, the Barstow Police Department received an anonymous tip stating that individuals from A and A Truck Wash located at 2250A Main Street, Barstow, California, were involved in drug trafficking. In March 2021, the CHS[1] referenced above also advised that employees of A and A Truck Wash were involved in trafficking methamphetamine. Upon receiving this information, law enforcement from the FBI and Barstow Police Department met with the CHS to discuss further details. According to the CHS, the CHS has purchased

---

[1] The CHS has been an informant with the FBI since May 2021. The CHS is also an informant for the Barstow Police Department ("BPD"). In March 2021, the CHS provided the BPD with information regarding narcotics trafficking at A and A Truck Wash which was corroborated by another police report from BPD stating that individuals are dealing drugs out of A and A Truck Wash in Barstow, CA. The CHS has prior felony convictions for common law robbery (1994), breaking and entering (1998), flee/elude arrest with a motor vehicle (1999), felony auto theft (1999), issuing worthless checks (1999), assault on law enforcement (2002), and possession of a firearm by a convicted felon (2007). He was arrested on November 5, 2021, for brandishing a firearm on a highway, which is pending in the Superior Court for the State of California, Riverside County. The CHS is working for financial gain and been paid a total of $900 for this investigation.

methamphetamine from A and A Truck Wash in the past. Though the
CHS declined, personnel from the truck wash had also asked the
CHS if he/she would like to participate in trafficking
narcotics.

13.  On May 27, 2021, in the afternoon, the CHS, whom
agents followed, traveled to A and A Truck Wash for the purpose
of coordinating a potential future drug transaction. An unknown
male ("UNSUB 1") greeted the CHS and agreed on a price of $1,100
for two ounces of methamphetamine, to be delivered sometime the
following week. This meeting was recorded by investigators.[2]

**B.   Attempted Drug Buy on June 4, 2021**

14.  On June 4, 2021, the CHS planned to travel to A and A
Truck Wash, as he believed that UNSUB 1 would be present and
available to conduct the previously discussed drug transaction.
That afternoon, at the direction of investigators, the CHS
arrived at A and A Truck Wash, but UNSUB 1 was not present.
Personnel at the truck wash told the CHS that UNSUB 1 would not
be available for the rest of the day. The CHS left his/her
contact number and departed the area.

15.  Several hours later, the CHS received a phone call
from 424-402-7064,[3] which was registered to Dulce Esquivel

---

[2] Investigators provided the CHS with a handheld video and
audio recording device and instructed the CHS not to turn off or
otherwise interfere with the device. Prior to the meeting,
investigators searched the CHS's person and vehicle for
contraband and found nothing.

[3] Based on an administrative subpoena, I learned, this phone
number is registered to "Dulce Esquivel Vargas" with a service
and billing address of 520 Mount Vernon Ave., Barstow,
California 92311, which is SUBJECT PREMISES A.

Vargas, but used by Mario Esquivel VARGAS.[4] The caller asked the CHS to come back to the truck wash and stated, in sum and substance, that he had something good for the CHS. The CHS then indicated that he could not meet with the caller as he was out of the area at that time.

**C.   Drug Buy on June 8, 2021**

16.   On June 8, 2021, at the direction of investigators, the CHS placed a recorded phone call[5] to the -7064 number, which was answered by VARGAS.[6] VARGAS confirmed the transaction would involve "two ounces" for $1,100. When the CHS told VARGAS that he would meet him at the A and A Truck Wash, VARGAS said that the location was not good. Instead, VARGAS suggested the Flying J truck stop located at 2611 Fisher Boulevard, Barstow, California. As investigators were waiting for VARGAS to appear, they saw a black Toyota Corolla with California license plate 7SKZ765[7] driving into the area that was similar to the car seen earlier at SUBJECT PREMISES A. The CHS then met with VARGAS at

---

[4] As explained below, investigators did not initially identify the person with whom the CHS was dealing.  After the CHS conducted two controlled methamphetamine buys with the same person, investigators eventually identified him as VARGAS by stopping him for a traffic violation as he left SUBJECT PREMISES A driving the same car that he drove during the methamphetamine sales.

[5] The phone call was conducted on the CHS's cellular phone, on speaker phone, and recorded in person by investigators.

[6] FBI agents compared the voice on the June 8, 2021, and June 17, 2021, phone calls with the recorded audio from the subsequent in-person drug transactions and determined that the individual on the phone and the drug seller were the same person.

[7] A subsequent query revealed the car to be registered to "Vicente Rafael Anastacio," 520 Mount Vernon Ave. Barstow, California 92311, which is SUBJECT PREMISES A.

the Denny's restaurant attached to the Flying J truck stop. At that time, the CHS purchased two ounces of methamphetamine from VARGAS and departed the area. The suspected methamphetamine field-tested positive for methamphetamine. The suspected methamphetamine was sent to the Drug Enforcement Administration ("DEA") laboratory and confirmed to be 51.5 grams of actual methamphetamine. This meeting was recorded and live monitored by investigators.[8]

17.   At the conclusion of the drug buy, investigators conducted a spot check on SUBJECT PREMISES A and located the same black Toyota Corolla that VARGAS appeared to be driving to the meet location, parked at SUBJECT PREMISES A.

**D.   Drug Buy conducted utilizing CHS on June 17, 2021**

18.   On June 17, 2021, at the direction of investigators, the CHS returned to A and A Truck Wash in an attempt to contact UNSUB 1 or VARGAS and arrange another drug transaction. Upon his/her arrival, the CHS determined that A and A was closed. At that point, the CHS returned to a pre-determined meet location with investigators and placed a recorded phone call to the -7064 number. VARGAS answered and agreed with the CHS to an amount of "three ounces" for $1,400. The CHS suggested that they conduct the transaction at the Flying J truck stop.

19.   Investigators followed VARGAS as he departed SUBJECT PREMISES A in the black Toyota Corolla and followed him to the

---

[8] Investigators provided the CHS with a handheld video and audio recording device and instructed the CHS not to turn off or otherwise interfere with the device. Prior to the meeting, investigators searched the CHS's person and vehicle for contraband and found nothing.

mobile home park where SUBJECT PREMISES B is located. They saw
the black Toyota Corolla enter into the mobile home area, but
investigators were unable to determine which trailer VARGAS had
entered. The Toyota Corolla then left the mobile home park and
immediately went to the Flying J parking lot to meet with the
CHS. The CHS then entered the Toyota Corolla, which was parked
on the Denny's side of the same Flying J parking lot. At that
time, the CHS purchased three ounces of methamphetamine from
VARGAS. The suspected methamphetamine field-tested positive for
methamphetamine. The methamphetamine was sent to a DEA
laboratory and confirmed to be 81.9 grams of actual
methamphetamine. During the transaction, VARGAS offered to get a
"pound" to the CHS for $6,000. VARGAS also claimed that the
pound would be coming from Mexico. This meeting was also
recorded and live monitored by investigators.

20.   Based upon my training and experience, and my
discussions with other law enforcement officers, I believe
VARGAS used "pound" as coded language for methamphetamine.
Additionally, based upon my training and experience, and my
discussions with other law enforcement officers, I know that
"pound" is a common term used by narcotics traffickers to refer
to a pound of methamphetamine. During a debrief with the CHS,
the CHS informed law enforcement that he understood that VARGAS
was using "pound" to refer to a pound of methamphetamine.

E.   **Spot check conducted on SUBJECT PREMISES B**

21.   On June 30, 2021, I completed a spot check on SUBJECT
PREMISES B at approximately 12:00 p.m. During the spot check, I

saw a black Chevy truck bearing license plate 78315M2, registered to Rafael Vicente, 520 Mount Vernon Ave., Barstow, CA 92311, which is SUBJECT PREMISES A, parked behind the fence surrounding the trailer. Investigators saw VARGAS driving the same truck earlier in the day prior to the June 17, 2021, drug buy.

**F.    Positive Identification Received for VARGAS**

22.    On August 18, 2021, investigators conducted surveillance on VARGAS at SUBJECT PREMISES A. They saw VARGAS exiting SUBJECT PREMISES A and entering the black Toyota Corolla he had been seen driving previously. Barstow Police Department stopped VARGAS for tinted front windows in violation of California Vehicle Code Section 26708(a)(I).  The driver was identified as VARGAS.[9] VARGAS did not have a valid California driver's license and gave a Mexican Consular card as identification.

23.    Since VARGAS was not a licensed driver, Barstow Police Department had the vehicle towed, and the officer gave VARGAS a ride to the trailer park which contains SUBJECT PREMISES B.

**G.    Hand-to-Hand Narcotics Transaction on September 16, 2021**

24.    On September 16, 2021, investigators established surveillance around SUBJECT PREMISES A. After several hours of movement in and out of the home with multiple people, investigators witnessed VARGAS and another unidentified male

_____

[9] Until this time, investigators did not know the identity of VARGAS. Since VARGAS is an undocumented alien in the United States there was no public information available about VARGAS being present at SUBJECT PREMISES A or SUBJECT PREMISES B.

exit the home and drive in a gray Infiniti to the ARCO gas station located at 2191 Main St., Barstow, CA 92311. Investigators saw the Infiniti driving toward the north end of the gas station toward the diesel fuel pumps designed for an 18-wheeler truck. While surveilling VARGAS, investigators saw him exit the Infiniti and talk to an unidentified male near an 18-wheeler truck; it appeared to investigators that something was exchanged between the unidentified male and VARGAS. VARGAS then left the location in the Infiniti and returned back to SUBJECT PREMISES A while the 18-wheeler truck driver and passenger departed the area as well.

25.   In my training and experience, and based on what I have learned in this investigation, I believe that VARGAS was conducting a hand-to-hand drug sale with the unidentified male at the gas station.

**H.   Drug Buy on November 4, 2021**

26.   On November 4, 2021, at the direction of investigators, the CHS placed a recorded phone call[10] at approximately 10:18 a.m. to the -7064 number, which was answered by VARGAS. VARGAS and the CHS discussed the price for "one pound," and VARGAS confirmed the transaction would involve "one pound" for $3,500 and a meet at the Flying J truck stop. The CHS then advised that he/she would call VARGAS back in 30 to 45 minutes when he/she was closer to the meet location.

---

[10] The phone call was conducted on the CHS's cellular phone, on speaker phone, and recorded in person by investigators.

27.   VARGAS left SUBJET PREMISES A in a white utility work truck with California License plate number 6N63829, registered to Jefferzon Omar Esquivel Vargas, 520 Mount Vernon Ave. Barstow, CA 92311 (which is SUBJECT PREMISES A). VARGAS proceeded directly to SUBJECT PREMISES B where another vehicle, a white Lincoln Navigator with California License Plate number 8VFU675, registered owner Martin Minguela, 932 E. Virginia Way, Barstow, CA 92311, met with VARGAS outside of a fenced off area at approximately 10:36 a.m. Investigators saw VARGAS and the unknown male in the Lincoln Navigator on pole camera footage talking for a few seconds and then enter SUBJECT PREMISES B. Both men were inside of SUBECT PREMISES B for approximately two minutes before exiting and departing in separate cars. The white Lincoln Navigator exited the area at approximately 10:40 a.m. and the white utility truck VARGAS was driving departed the area at approximately 10:42 a.m.

28.   Aerial surveillance captured VARGAS pulling off the road several times while driving to his next location. Based on my training and experience, I believe VARGAS's driving behavior was consistent with counter surveillance techniques used by drug traffickers to identify and/or elude surveillance by law enforcement.

29.   Investigators followed the white Lincoln Navigator to 932 E. Virginia Way. Barstow, CA 92311, and they were followed shortly by VARGAS inside the utility truck. VARGAS and the unknown male were seen talking for a short period on the driveway of the home until VARGAS and the unknown male entered

the home, with VARGAS exiting approximately one minute after entering.

30. VARGAS then returned to SUBJECT PREMISES A inside the white utility truck. At approximately 11:27 a.m., the CHS notified VARGAS that he/she was at the buy location and described the car the CHS was driving. VARGAS departed SUBJECT PREMISES A and drove exclusively on roads, as opposed to driving on the freeway, which would have been a much faster route. Based on my training and experience and talks with other law enforcement officers, this is due to California Highway Patrol drug task forces in the area and to detect any surveillance that may be on to them based on the desolate roads located in Barstow.[11]

31. VARGAS arrived at the buy location inside the white utility truck at approximately 11:44 a.m. This meeting was recorded and live monitored by investigators.[12] The CHS exited the vehicle and entered VARGAS's vehicle. While inside VARGAS's vehicle the CHS exchanged $3,500 for one pound of methamphetamine.[13] The suspected methamphetamine field-tested

---

[11] Due to the remote location of SUBJECT PREMISES B and the surrounding Barstow area, investigators requested aerial surveillance, which remained on VARGAS during the duration of this operation.

[12] Investigators provided the CHS with a handheld video and audio recording device and instructed the CHS not to turn off or otherwise interfere with the device. Prior to the meeting, investigators searched the CHS's person and vehicle for contraband and found nothing.

[13] FBI agents compared the voice on the June 8, 2021, and June 17, 2021, phone calls with the recorded audio from the subsequent in-person drug transactions and determined that the individual on the phone and the drug seller were the same person.

positive for methamphetamine. The methamphetamine was sent to a DEA laboratory and confirmed to be 447 grams of actual methamphetamine. The CHS also talked to VARGAS about possibly setting up another buy before Thanksgiving for a possible "five pounds" of methamphetamine.

32.  Following their meeting, VARGAS departed the location and arrived back at SUBJECT PREMISES B at approximately 11:52 a.m. and entered the trailer. VARGAS exited SUBJECT PREMISES B and reentered the trailer at approximately 11:58 a.m. with another unidentified male, and both men exited approximately 30 seconds later. VARGAS departed the area and drove directly to 932 E. Virginia Way. Barstow, CA 92311. VARGAS was only at the home for a few minutes, then departed and arrived back at SUBJECT PREMISES A.

## V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

33.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.   Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their

vehicles in the event of an unexpected opportunity to sell narcotics arises.

       f.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences and vehicles.

       g.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes. They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

       h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[14]

34.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[14] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

35.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

36.    The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress VARGAS's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of VARGAS's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

37.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

## VII. <u>CONCLUSION</u>

38.   For all of the reasons described above, there is probable cause to believe that VARGAS has committed a violation of 21 U.S.C. §§ 841(a)(1) (b)(1)(A)(viii) (distributing 50 grams or more of methamphetamine. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES A and SUBJECT PREMISES B as described in Attachments A-1 and A-2.

Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by telephone on this 16th day of December,
2021.

_____
HONORABLE KENLY KIYA KATO
UNITED STATES MAGISTRATE JUDGE